UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                    :
                                          :       Chapter 7
JVJ PHARMACY INC. D/B/A UNIVERSITY        :
CHEMISTS,                                 :       Case No. 16-10508 (SMB)
                                          :
                        Debtor.           :
------------------------------------------------------X
SALVATORE LAMONICA, AS CHAPTER 7          :
TRUSTEE OF THE ESTATE OF JVJ              :
PHARMACY INC. D/B/A UNIVERSITY            :       Adv. Pro. No. 18-01853 (SMB)
CHEMISTS,                                 :
                                          :
                        Plaintiff,        :
                                          :
            - against -                   :
                                          :
HARRAH'S ATLANTIC CITY OPERATING          :
COMPANY, LLC D/B/A HARRAH'S RESORT        :
ATLANTIC CITY,                            :
                                          :
                        Defendant.        :
------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

LaMONICA HERBST & MANISCALCO, LLP
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793

    David A. Blansky, Esq.
        Of Counsel

*Attorneys for Plaintiff*

GRIFFIN HAMERSKY LLP
420 Lexington Avenue, Suite 400
New York, New York 10170

    Scott A. Griffin, Esq.
    Michael D. Hamersky, Esq.
        Of Counsel

- and -

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

     Frank M. Flansburg III, Esq.
     Maximilien D. Fetaz, Esq.
       Of Counsel

*Attorneys for Defendant*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

     Plaintiff Salvatore LaMonica, the chapter 7 trustee ("Trustee") for the estate of

JVJ Pharmacy Inc. d/b/a University Chemists ("Debtor"), filed an adversary proceeding

against the defendant, Harrah's Atlantic City Operating Company, LLC, d/b/a/ Harrah's

Resort Atlantic City ("Harrah's").  The Trustee seeks to recover $859,040 in transfers

(the "Transfers") that the Debtor allegedly made to or for the benefit of Harrah's when

the Debtor's principal, James F. Zambri, used the Debtor's debit card to initiate cash

advances at ATM's on Harrah's property.  The Trustee makes his claims under

fraudulent transfer and unjust enrichment theories.  The Trustee and Harrah's filed

cross-motions for summary judgment.  (*Memorandum of Law in Support of Plaintiff's*

*Motion for Partial Summary Judgment on His Amended Complaint*, dated April 10,

2020 ("*Trustee's Motion*") (ECF Doc. # 57-1); *Harrah's Atlantic City Operating*

*Company LLC d/b/a Harrah's Resort Atlantic City's Memorandum of Law in Support*

*of its Motion for Summary Judgment*, dated April 10, 2020 ("*Harrah's Motion*") (ECF

Doc. # 58).)[1]  The parties also filed a Joint Statement of Undisputed Fact in support of

---

[1]    "ECF Doc. #" refers to the documents filed on the electronic docket of this adversary proceeding. "ECF Main Case Doc. #" refers to the documents on the electronic docket of the main case, No. 16-10508 (SMB).

their cross-motions.  (*Joint Statement of Undisputed Facts in Support of Cross-Motions for Summary Judgment*, dated February 28, 2020 ("*Joint Statement*") (ECF Doc. # 48).)

For the reasons that follow, the *Trustee's Motion* is granted with respect to Count 2 of the of his *Amended Complaint*, dated June 7, 2019 (ECF Doc. # 25), he is awarded the sum of $850,449.60, and the *Trustee's Motion* is otherwise denied.  *Harrah's Motion* is granted as to Counts 1 and 3 through 7 and is otherwise denied.

## BACKGROUND

At all relevant times, the Debtor operated a specialty pharmacy located at 74 University Place, New York, NY 10003.  (¶ 1.)[2]  Zambri was the Debtor's president, (¶¶ 2-3), and sole shareholder.  (Voluntary Petition, List of Equity Security Holders (ECF Main Case Doc. # 1), at ECF p. 39 of 46.)[3]  The Debtor maintained an operating account at a branch of JPMorgan Chase Bank, N.A. located in the State of New York (the "Chase Account".  (¶ 5.)  A debit card issued to the Debtor could be used to withdraw cash from Debtor's Chase Account.  (¶ 71.)  Harrah's operates the Harrah's Resort located in Atlantic City, New Jersey, (¶ 8), and Zambri used the Debtor's debit card to initiate cash advances at ATMs located on Harrah's property.  (¶ 70.)  In the main, the Trustee seeks through this adversary proceeding to recover the transfers from the Chase Account that covered the cash advances received by Zambri as fraudulent transfers.

---

[2]      The parenthetical "¶" refers to the paragraphs in the *Joint Statement*.

[3]      "ECF p." refers to the page numbers printed by the ECF system at the top of each page.

### A.    Harrah's Cash Advances

To understand the disposition of the cross-motions, it is necessary to review how the cash advances and the corresponding repayments from the Chase Account worked. Caesars, Harrah's affiliate[4], contracted with Ultron Processing Services, Inc. ("Ultron") pursuant to a Master Services Agreement ("Ultron MSA")[5] for services related to the ATMs on Harrah's premises.[6]  (¶¶ 17-19.)  A patron could obtain cash at Harrah's in one of two ways.  He could withdraw cash directly from the Ultron ATM which Harrah's stocked with cash.  (Ultron MSA, Ex. B, § 5.b.v. at JVJ000364.)  Ultron would charge the patron's debit or credit card and collect the payment from the patron's bank as agent for Caesars.  (Ultron MSA, Ex. A, § 1.gg at JVJ000486.)[7]  Alternatively, a patron could obtain cash advances directly from Harrah's utilizing the ATM pursuant to a separate

---

[4]    The parties use Caesars and Harrah's interchangeably in their motion papers.  While Caesars is the contracting party, Harrah's is covered by the relevant contracts as an "affiliate."  (*See* ¶¶ 25, 47.)  The Court will refer to both as Harrah's.

[5]    The Ultron MSA is attached as Exhibit 2 to the *Joint Statement.*

[6]    The Ultron MSA provides that "Caesars shall, at its expense . . . [p]erform cash usage management, and supply and replenish each Casino Transaction Kiosk at the Locations using Caesars cash and personnel."  (Ultron MSA at Ex. B at § 5.b.v.)

[7]    Ultron MSA, Ex. A, § 1.gg, provides in pertinent part:

. . . When a Cardholder (as defined in Exhibit B) uses a Casino Transaction Kiosk to obtain cash, the Casino Transaction Kiosk will dispense cash, that is stored inside the Casino Transaction Kiosk, to the Cardholder.  Pursuant to Section 5(B)(5) of Exhibit B, [Caesars] is responsible for providing the cash necessary to supply and replenish the cash supply that is stored inside the Casino Transaction Kiosks. When a Casino Transaction Kiosk dispenses cash to the Cardholder, a related transaction occurs whereby monies are deducted from the Cardholder's account and are paid to [Ultron]. The parties acknowledge that [Ultron] will receive such monies as [Caesars's] agent in accordance with Exhibit B. . . .

Master Services Agreement ("Global MSA")[8] between Harrah's and Global Cash Access, Inc. ("Global"), in the manner described below.  (¶¶ 30-31.)

Zambri utilized these cash advance services provided by Global rather than the cash withdrawal services provided by Ultron.  To initiate a cash advance at an Ultron ATM located on Harrah's property, the Cardholder inserts a debit card and enters the amount of the request; Global verifies the Cardholder's available credit limit and/or account balance, obtains proper authorization from the Card issuer, and confirms that Harrah's has complied with various security protocols.  (*See* ¶ 33; Global MSA, Ex. B, § 1 at JVJ000616.)  Assuming the Cardholder qualifies for the cash advance, he receives a receipt from the Ultron ATM directing him to proceed to Harrah's cashier's cage where he presents the receipt to the cashier.  (¶¶ 48-49, 52.)  Per the Global MSA, (Global MSA, Ex. B-1 at JVJ000620-JVJ000621), the Harrah's cashier accesses Global's processing system, pulls up the pending transaction, verifies the identification of the person receiving the cash advance, and distributes Harrah's cash to the person seeking the advance.  (¶¶ 48, 50-51, 53-54, 64.)  Global collects the cash from the Cardholder's bank and reimburses Harrah's in the amount of the cash advance through a batch settlement the next federal wire day.  (¶¶ 65-66.)

Global and Caesars split a processing fee the Cardholder must be paid for a cash advance.  For cash advances initiated with a debit card, Global earns 25% of a 4% fee on the amount of cash advanced, and Harrah's receives the balance.  (¶¶ 39, 42-44; Global MSA, Ex. B at § 11.B.2 at JVJ000618.)  Global, which has collected the entire processing

---

[8]    The Global MSA is attached as Exhibit 3 to the *Joint Statement*.

fee, settles up with Harrah's on a monthly basis.  (Global MSA, Ex. B, § 11.C at JVJ000618.)

The outcome of this adversary proceeding turns on the relationship between Harrah's and Global.  Although the Global MSA indicates that neither party intended for the other party to be viewed as its agent, (Global MSA, Ex. A, § 21.b, at JVJ000614) ("At no time will either Party represent itself as an agent . . . of the other Party"), Section 1 to Exhibit B of the Global MSA states one notable exception; Global serves as Harrah's agent in connection with "quasi-cash advance services":

> [Caesars] engages [Global] to act as its agent for the sole purpose of providing a quasi-cash advance services, whereby the authorized holders (individually, a "Cardholder") of a valid credit or ATM/debit card (individually, a "Card" and collectively, the "Cards") . . . may obtain quasi-cash advances (individually, a "Cash Advance") in exchange for a service charge, subject in each case to (i) the Cardholder's available credit limit and/or account balance, (ii) receipt of proper authorization for the Cash Advance transaction from the Card issuer, and (iii) compliance by [Caesars] with security policies and procedures established by the Card Associations, Network Organizations and [Global] from time to time; and [Global] and [Caesars] desire to enter into this Agreement, whereby [Global] will supply Cash Advances at the Locations listed on Schedule A for Cardholders who will ultimately purchase gaming chips or other products and services from the Company (referred to herein as the "Service").

(Global MSA, Ex. B, § 1 at JVJ000616.)

The Global MSA allocates the responsibility for an improper or unauthorized cash advance.  If Global incorrectly verifies that an account had sufficient funds and cannot collect the cash advance from the Cardholder's bank account, Global guarantees the transaction and must reimburse Harrah's for any cash Harrah's advanced.  (¶ 37;

6

Petrosh Transcript[9] at 19:23-20:6.)  In addition, Global is required to indemnify Harrah's for "any claim arising from the negligence of [Global], it's employees, and third-party contractors used in performance of [Global's] obligations pursuant to this Agreement and any related SOW."[10]  (Global MSA, Ex. A, § 11.a.i.4 at JVJ000611.)  On the other hand, Harrah's must reimburse Global for the full amount of the cash advance where, according to applicable rules, the Cardholder validly disputes the cash advance, the Card issuer charges back the cash advance for any valid reason, or Global has any reason to believe that a Cash Advance is questionable, fraudulent, not genuine, or is otherwise unacceptable.  (Global MSA, Ex. B, § 4.3 at JVJ000617.)

Although the Global MSA reads as if Global is making the cash advance, this is not how it worked.  Global facilitates the transaction between the Cardholder and Harrah's but does not advance any funds; the funds are advanced by Harrah's cashier and repaid by the Cardholder's bank to Global, Harrah's agent.  As Ryan Carlson, Harrah's Federal Civil Rule 30(b)(6) witness, (*see Joint Statement*, Ex. 1, at ECF p. 3 of 30), explained, the Cardholder's bank reimburses Global for the cash advanced and remits any associated fees, Global then reimburses Harrah's for the cash advance in a batch settlement on the next federal wire day through ACH, and the portion of the fees on the cash advances shared with Global are paid monthly after an accounting process. (¶¶ 65-67.)  The only cash that Global retains upon collection from the Cardholder's bank is its 25% of the 4% processing fee, *i.e.*, 1% of the cash advance.

---

[9]    Excerpts of the Transcript of Deposition of Katie Petrosh ("*Petrosh Transcript*") are attached as Exhibit 4 to the *Joint Statement*.

[10]    "SOW" is not defined in the Global MSA.

**B.    Zambri's Cash Advances**

From January 2, 2015 to August 3, 2015 (the "Relevant Period), Zambri regularly initiated cash advances that resulted in withdrawals aggregating $859,040, inclusive of the 4% processing fee (*i.e.*, the Transfers), from the Chase Account. (¶¶ 70-71.) The receipts issued at Harrah's cage identified the transactions as a "PlayerCash@dvantage," *i.e.* a cash advance. (¶¶ 55-56; *Joint Statement*, Ex. 7.) Each receipt reported the cash advance amount and the total fee calculated at 4% and identified Zambri as the Cardholder and Harrah's Atlantic City as the merchant. (*Joint Statement* ¶¶ 57-59; *Joint Statement*, Ex. 7.) The Title 31 Multiple Transactions Log prepared and maintained by Harrah's to comply with applicable gambling regulations described each of the transactions at Harrah's cage as a "CASH ADVANCE" or "CCA," meaning cash advance. (¶¶ 81-83; Title 31 Log, *Joint Statement*, Ex. 10 at JVJ000064-JVJ000083.) The Chase Account statements recorded the Transfers as "PCA* Harrah's Ac Atlantic City, NJ Card 4488." (*Joint Statement*, Ex. 8.)

Zambri did not always gamble at Harrah's on the days that he initiated a cash advance, (¶ 73), or initiate cash advances on the days he gambled. During the Relevant Period, Zambri initiated cash advances and gambled on the same date only seventeen out of the forty-nine days he gambled at Harrah's. (¶ 74.) On the dates that Zambri initiated cash advances and gambled at Harrah's, the amount of each cash advance did not match the amount that Zambri used to gamble. (¶ 75.) In addition, Zambri was successful at times when he gambled at Harrah's. (¶ 86.) During the Relevant Period, Zambri gambled approximately $1,747,790.00 at Harrah's, (¶ 87), and won a total of $488,455.00. (¶ 88.) This may explain why he did not always take a cash advance on

the day he gambled or why the amount of the cash advance and the amount he gambled did not always match.

## D.   Bankruptcy and Adversary Proceeding

The Debtor filed a chapter 11 case on March 3, 2016, and the Court converted the case to chapter 7 on December 21, 2017.  On December 19, 2018, the Trustee commenced this adversary proceeding against Harrah's seeking to avoid and recover the Transfers as fraudulent transfers under Bankruptcy Code §§ 548(a)(1)(A) and 548(a)(1)(B) and as fraudulent conveyances under New York Debtor and Creditor Law ("NYDCL") §§ 273-276,[11]  made applicable through 11 U.S.C. § 544(b)(1), as well as under a theory of unjust enrichment.

The parties subsequently filed cross-motions for summary judgment.  Harrah's seeks summary judgment dismissing all of the claims.  First, it argues that New Jersey law rather than New York law governs all of the Trustee's claims, and his claims under the NYDCL (Counts 3 through 6) should be dismissed.  (*Harrah's Motion* at 5-9.) Second, the Debtor's funds were not transferred to Harrah's, and Harrah's was not, therefore, a transferee.  (*Id.* at 9-13.)  At most, Harrah's was Global's subsequent transferee and received the subsequent transfer in good faith, for value, and without knowledge of the avoidability of the initial transfer.  (*Id.* at 13-17.)  Third, the Trustee has failed to adduce evidence of fraudulent intent to support his claims of actual fraudulent transfer.  (*Id.* at 18-22.)  Fourth, even if Harrah's was the initial transferee,

---

[11]     All references to the NYDCL refer to the version of the NYDCL in existence at the time of the Transfers.  That version was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act.  *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

the constructive fraudulent transfer and unjust enrichment claims fail because Debtor received fair consideration and reasonably equivalent value in exchange for the Transfers when the cash was advanced to its principal, Zambri. (*Id.* at 22-29.)

The Trustee contends in his own motion and in opposition to *Harrah's Motion* that the NYDCL governs. (*Trustee's Motion* at 6-9.) He asserts that the Transfers may be avoided pursuant to Bankruptcy Code § 544(b)(1) through NYDCL §§ 273, 274 and 275 and § 548(a)(1)(B), and the value of the Transfers can be recovered pursuant to § 550(a). (*Id.* at 10.) He argues that the Debtor made the Transfers to or for the benefit of Harrah's through electronic withdrawals from its Chase Account, the Transfers were paid to Harrah's agent, Global, and Harrah's was, therefore, the initial transferee. (*Id.* at 12-16.) Furthermore, the Debtor did not receive fair consideration or reasonably equivalent value and was insolvent at the time of the Transfers. (*Id.* at 16-21.) In addition to his fraudulent transfer claims, the Trustee also seeks summary judgment on an unjust enrichment claim. (*Id.* at 23-24.)

## DISCUSSION

### A    Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). The fraudulent conveyance claims are core proceedings. 28 U.S.C. § 157(b)(2)(H). The unjust enrichment claim arose under state laws before the bankruptcy case and is non-core.

The Court has the authority to enter a final judgment on all claims. In accordance with Rule 7008 of the Federal Rules of Bankruptcy Procedure, the Trustee

expressly consented to the Court's authority to enter a final judgment in paragraph 5 of

his *Complaint*, dated Dec. 19, 2018 (ECF Doc. # 1), and paragraph 5 of the *Amended*

*Complaint.*

While Harrah's did not expressly consent, its consent is implied. "[T]he key

inquiry is whether 'the litigant or counsel was made aware of the need for consent and

the right to refuse it, and still voluntarily appeared to try the case' before the non-Article

III adjudicator." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932,

1948 (2015) (quoting *Roell v. Withrow,* 538 U.S. 580, 590 (2003)). First, Harrah's was

aware of its right to consent or withhold consent. Rule 7012(b) of the Federal Rules of

Bankruptcy Procedure requires the responding pleader to state whether it does or does

not consent to the entry of a final judgment by the bankruptcy judge. Although

forewarned by Rule 7012(b) and the Trustee's *Complaint* and *Amended Complaint*

regarding the need to allege consent or the withholding of consent, Harrah's *Answer*,

(ECF Doc. # 36), and *Amended Answer*, (ECF Doc. # 37), to the *Amended Complaint*

ignored the mandate of Rule 7012(b) and substituted the non-responsive statement

"[w]ith respect to the allegations contained in paragraph 5 of the Plaintiff's Amended

Complaint, no factual response from Harrah's is required." Second, Harrah's

voluntarily litigated the merits of the claims. It made two motions to dismiss, a motion

for summary judgment, and defended against the Trustee's summary judgment motion

without raising an objection to the Court's authority to hear the dispute or enter a final

judgment.

In short, Harrah's was made aware of the opportunity to withhold its consent to

the Court's authority to enter a final judgment; it failed to do so and instead, engaged in

substantial litigation before the Court relating to the merits of the Trustee's claims. Accordingly, it impliedly consented to the Court's authority to enter a final judgment.

## B.    Standards Governing the Motions

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quotation omitted). The Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When deciding whether a genuine dispute exists as to a material fact, all ambiguities must be resolved, and all reasonable inferences must be drawn, in favor of the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the records as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

## C.    Choice of Law

The parties dispute whether New York or New Jersey law governs the fraudulent transfer claims.  "[W]here no significant federal policy, calling for the imposition of a federal conflicts rule, exists, a bankruptcy court must apply the choice of law rules of the forum state."  *Geron v. Seyfarth Shaw, LLP* (*In re Thelen LLP*), 736 F.3d 213, 219 (2d Cir. 2013) (internal quotation marks and citations omitted).  Under New York conflicts principles, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 382 (2d Cir. 2006) (internal quotation marks omitted).

Both sides agree that an actual conflict exists between New York and New Jersey constructive fraudulent transfer law.  Under the NYDCL, a plaintiff can establish a constructive fraudulent conveyance if the transfer is made "without fair consideration."  NYDCL §§ 273-75.

> Fair consideration is given for property, or obligation,
>
> (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and *in good faith*, property is conveyed or an antecedent debt is satisfied, or
>
> (b) When such property, or obligation is received *in good faith* to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or the obligation obtained.

NYDCL § 272 (emphasis added).  Hence, a plaintiff may prevail by proving either the absence of an equivalent exchange of value *or* the lack of good faith by either the transferor or the transferee.

13

New Jersey has adopted the Uniform Fraudulent Transfer Act ("UFTA") under which a transfer by an insolvent is fraudulent as to present creditors if it is made for less than reasonably equivalent value. N.J. STAT. § 25:2-27. "[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave,' considering the totality of the circumstances surrounding the disputed transfer." *Motorworld, Inc. v. Benkedorf*, 156 A.3d 1061**,** 1071 (N.J. 2017) (quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)). "[T]he factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) *the good faith of the transferee*." *Id.* (emphasis added) (quoting *Grochocinski v. Schlossberg* (*In re Eckert*), 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008), *aff'd*, 402 B.R. 825 (N.D. Ill. 2009)); *accord Thor 725 8th Ave. LLC v. Goonetilleke*, Civ. No. 17-318, 2019 WL 5304146, at \*6 (D.N.J. Oct. 17, 2019). Thus, the transferor's good faith is relevant under New York law but not under New Jersey law, and an actual conflict exists.

New York law treats a fraudulent conveyance as a tort. *Cruden v. Bank of New York,* 957 F.2d 961, 974 (2d Cir. 1992); *Geron & Robinson & Cole LLP*, 476 B.R. 732, 737-38 (S.D.N.Y. 2012); *Drenis v. Haligiannis*, 452 F.Supp.2d 418, 426-27 (S.D.N.Y. 2006). "'[T]he relevant analytical approach to choice of law in tort actions in New York is the '[i]nterest analysis,'" *GlobalNet Financial.com,* 449 F.3d at 382 (quoting *Schultz v. Boy Scouts of Am., Inc.,* 480 N.E.2d 679, 684 (N.Y. 1985)), which seeks "to determine which of two competing jurisdictions has the greater interest in having its law applied in

the litigation." *Padula v. Lilarn Properties Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994); *accord Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998).  This requires two separate inquiries: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Padula*, 644 N.E.2d at 1002; *accord Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).

The first inquiry is easy because the only significant contacts were in New Jersey. Zambri resides in New Jersey,[12] traveled to Harrah's Atlantic City casino in New Jersey to gamble, and initiated the Transfers there.  Harrah's has no significant contacts with New York.  While the Debtor maintained the Chase Account in New York, the location of the bank account was immaterial to the wrongful conduct that resulted in the fraudulent transfers.

The second inquiry is less straightforward.  Fraudulent conveyance laws are conduct regulating, and "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Lyman Commerce Solutions, Inc. v. Lung*, No. 12–cv–4398, 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014).  When the alleged wrongful conduct and the injury occur in different places, "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Licci*

---

[12]        According to the List of Equity Securities Holders included with the petition and cited earlier, Zambri resides at 2020 Winding Brook Way, Scotch Plains, New Jersey 07076.

*ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50-51 (2d Cir. 2013) (quoting *Schultz,* 480 N.E.2d at 684-85); *accord Lyman,* 2014 WL 476307, at *3 (for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls.") (citation omitted)).

Here, the wrongful conduct occurred in New Jersey.  Zambri initiated the fraudulent transfers the Trustee is seeking to recover and received the fruits of his fraudulent conduct in New Jersey.  Furthermore, New Jersey has the superior interest in regulating fraudulent conduct in New Jersey casinos.  Finally, although the Transfers stripped the Debtor's New York bank account, they injured the Debtor's then-present creditors who resided in all sections of the nation.  The purpose of New York's fraudulent conveyance law "is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property."  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995).  Outside of bankruptcy, a fraudulent conveyance action is a creditor remedy and a transferor cannot recover its own fraudulent conveyances under the NYDCL.  It is only the intervention of bankruptcy that allows a trustee to assert a fraudulent conveyance claim on behalf of the debtor-transferor under Bankruptcy Code §§ 544(b)(1) and 548(a).

According to the Debtor's schedules, the only evidence on this issue, the majority of the Debtor's creditors were located outside of New York as of the Petition Date.  The Debtor's amended Schedule E/F (ECF Main Case Doc. # 46) listed twenty-seven unsecured creditors holding $1,411,928.20 of unsecured debt.  The list identified six New York creditors holding $102,463.41 of unsecured debt.  It also listed two New

16

Jersey creditors (one of which is Zambri) holding $514,913.02 of unsecured debt.  The

balance of the creditors and the debt were scattered throughout the nation.  Thus, even

if the Transfers depleted the Debtor's New York bank account, New York's sole contact

with this dispute, it is not sufficient to overcome New Jersey's superior interest in

regulating fraudulent conduct within its borders and the substantial injury caused to the

Debtors' creditors the majority of which were located outside of New York, at least as of

the Petition Date.

Accordingly, New Jersey fraudulent transfer law governs the Transfers, and

Harrah's motion for summary judgment dismissing the claims under the NYDCL

asserted in Counts 3 through 6 of the *Amended Complaint* is granted.

## D.    Bankruptcy Fraudulent Transfer Provisions

Bankruptcy Code § 548 permits the Trustee to recover both intentional and

constructive fraudulent transfers.

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in
> property . . . that was made or incurred on or within 2 years before the
> date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual
> intent to hinder, delay, or defraud any entity to which the debtor was or
> became, on or after the date that such transfer was made or such
> obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange
> for such transfer . . . ; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such
> obligation was incurred, or became insolvent as a result of such transfer or
> obligation . . . ."[13]

---

[13]    Section 548(a)(1)(B)(ii) includes two additional financial tests: the "unreasonably small capital"
test, § 548(a)(1)(B)(ii)(II), and the intention to incur debts beyond the ability to pay as they mature, §
548(a)(1)(B)(ii)(III).  In light of the disposition of the constructive fraudulent transfer claim, I limit my
consideration to the insolvency test.

Where the trustee avoids the initial transfer under § 548(a), § 550 governs his recovery:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548, . . . the trustee may recover . . . the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.
>
> (b) The trustee may not recover under section (a)(2) of this section from—
>
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
>
> (2) any immediate or mediate good faith transferee of such transferee.

### 1.    Intentional Fraudulent Transfer

In Count 1, the Trustee pleads that the Debtor made the Transfers with the intent to hinder, delay, or defraud its creditors, (*Amended Complaint* ¶ 44), and cites § 548(a)(1)(A).  (*Amended Complaint* ¶ 54.)  Count 1 also includes allegations that appear to invoke the constructive fraudulent transfer provisions of § 548(a)(1)(B), (*see Amended Complaint* ¶ 45 ("Debtor received less than reasonably equivalent value"); *id.* ¶ 51 (alleging balance sheet insolvency); *id.* ¶ 53 (alleging equitable insolvency)), but the constructive fraudulent transfer claim under § 548(a)(1)(B) is expressly reserved for Count 2.  Accordingly, I read Count 1 as alleging an intentional fraudulent transfer claim under § 548(a)(1)(A).

The Trustee did not move for summary judgment on his intentional fraudulent transfer claim under Count 1 (or his NYDCL intentional fraudulent conveyance claim alleged in Count 6), but Harrah's did.  It argued that the Trustee failed to allege intent.

18

The Trustee did not respond to this argument, and accordingly, Counts 1 and 6 are deemed abandoned.[14] *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.,* No. 92–CV–1735, 1998 WL 118174, at *28 (S.D.N.Y. March 16, 1998) (deeming claim "abandoned" and granting summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion).  Accordingly, *Harrah's Motion* to dismiss Count 1 is granted.

### 2.    Constructive Fraudulent Transfer

Count 2 pleads a constructive fraudulent transfer claim under § 548(a)(1)(B). Each side moves for summary judgment on Count 2.  To satisfy the requirements of the subsection under the insolvency test, the Trustee must demonstrate as a matter of law that the Debtor made a transfer to Harrah's at a time when it was insolvent or rendered insolvent and received less than reasonably equivalent value in exchange for the Transfers.  The question of Harrah's good faith or what it knew or should have known is not material to the Trustee's affirmative case.

There is no dispute that the withdrawals from the Chase Account were transfers by the Debtor.  Furthermore, the Trustee submitted the expert report of his accountant, Joseph A. Broderick, CPA, who opined the Debtor was insolvent during the entire Relevant Period.[15]  (*See* ¶ 93.)  Harrah's did not serve a rebuttal expert report or contest the Debtor's insolvency, and accordingly, the Trustee has established insolvency.

---

[14]    Count 6 asserted under the NYDCL has already been dismissed on the separate ground that the NYDCL does not apply.

[15]    The Expert Report of Joseph A. Broderick is attached as Exhibit 14 to the *Joint Statement.*

The principal issue that divides the parties is the identity of the initial transferee. The Trustee contends that Harrah's was the initial transferee of the Transfers; Harrah's claims it was Global, and at most, Harrah's was Global's subsequent transferee who received the subsequent transfers in good faith, for value, and without knowledge of the avoidability of the initial transfer.

### a.    The Initial Transferee

It is common ground that Global received the Transfers from the Chase Account in connection with its cash advance services.  However, the first recipient of the funds is not necessarily the "initial transferee" of the funds.  *Christy v. Alexander & Alexander of New York Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 56-57 (2d Cir. 1997) (collecting cases); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).  Discussing the preference provision of the former Bankruptcy Act, Chief Judge Cardozo explained:

> One who accepts a preference not for his own account but as agent for a principal is not 'the person receiving it or to be benefited thereby.' . . . The one who receives a preference . . . within the meaning of the statute, is the one who is preferred, and the one who is preferred is not the mere custodian or intermediary, but the creditor, present or contingent, who receives by virtue of the preference an excessive share of the estate.

*Carson v. Federal Reserve Bank of New York*, 172 N.E. 475, 482 (N.Y. 1930); *accord In re Maxwell Newspapers, Inc.*, 151 B.R. 63, 70 (Bankr. S.D.N.Y. 1993) (citing cases).

Thus, where the recipient—the first entity to touch the transferred property—is contractually obligated to turn it over to a third-party, the recipient is a "mere conduit" and the entity it pays the transfer to is the "initial transferee."  *Finley Kumble,* 130 F.3d at 58 (citing *Danning v. Miller* (*In re Bullion Reserve of N. Am.*), 922 F.2d 544, 548-49

(9th Cir. 1991) (where recipient of money had contractual obligation to immediately transfer funds, he was not initial transferee even though the funds were eventually spent for his benefit) (parenthetical quoted in *Finley Kumble*); *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.)*, 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993) ("Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees for purposes of [11 U.S.C. § 550]"); *see generally* 5 COLLIER ON BANKRUPTCY ¶ 550.02[4][a] (16th ed. 2020); *cf. In re 360networks (USA) Inc.*, 338 B.R. 194, 204 n.11 (Bankr. S.D.N.Y. 2005) ("[W]here a 'mere conduit' retains possession of some portion of the funds, he will be held liable up to the amount which he retains.") (quoting *Maxwell Newspapers*, 151 B.R. at 70)).

Under the Global MSA and as confirmed by Harrah's Rule 30(b)(6) witness, Global acted as Harrah's "agent" in connection with the cash advance services which included collecting the repayment from the Chase Account for Harrah's. Global did not advance any of its own funds to Zambri and was not entitled to retain the money it collected from the Chase Account except for its portion of the processing fee. It was contractually obligated to pay the balance to Harrah's and reimbursed Harrah's for the cash advance as part of a batch settlement on the next federal wire day through ACH. (¶¶ 65-67.) Moreover, the Chase Account monthly statements show that the Transfers were made to Harrah's. (*Joint Statement*, Ex. 8.) Finally, while the Global MSA identified certain situations calling for Harrah's to reimburse Global for cash advances, there was nothing to reimburse other than the 1% processing fee when Global did not advance its own funds, and Harrah's does not contend in any event that its

reimbursement obligation was triggered in this case.  Accordingly, Harrah's was the initial transferee of the Transfers within the meaning of § 548(a) except for the portion of the processing fee that Global retained.[16]

The conclusion that Harrah's is the initial transferee is consistent with the practical concerns expressed by the *Bonded Financial* Court when it compared the potential liability of initial and subsequent transferees.  The initial transferee bears the burden of inquiry and the risk if the conveyance is fraudulent because the initial transferee is the best position to monitor the transfer from the transferor.  *Bonded Fin.*, 838 F.2d at 893.  In this case, Global, Harrah's agent, dealt directly with Zambri, processed his request for cash, confirmed the availability of funds in the Debtor's Chase Account and took the necessary steps to assure reimbursement from that account before generating the receipt redeemed by Zambri at Harrah's cashier's cage.  Global was in the best position to monitor the Transfers and knew or certainly should have known that the Debtor rather than Zambri was the owner of the Chase Account.   Harrah's bore the risk

---

[16]    The facts are analogous to the situation in which a corporate principal pays a personal debt with a corporate check.  In that circumstance, the creditor who received the payment is the initial transferee and the corporate principal, whose debt was discharged, is the party for whose benefit the transfer was made. *Tese-Milner v. Brune* (*In re Red Dot Scenic, Inc.*), 293 B.R. 116, 122 (S.D.N.Y.), *aff'd*, 351 F.3d 57 (2d Cir. 2003).  This is the one-step transaction hypothesized by Judge Easterbrook in *Bonded Fin.*, 838 F.2d at 893; *accord Red Dot Scenic*, 293 B.R. at 119 ("[T]he [*Bonded*] Court distinguished between a one-step transaction in which a debtor's check is paid directly to its principal's creditor and a two-step transaction in which the check is paid to the principal, who then pays his personal creditor.  In the first situation, the creditor is the initial transferee.  In the second situation, the situation that arose in *Bonded* itself, the principal is the initial transferee and the principal's creditor is a subsequent transferee.")  Here, Zambri did not use a corporate check to pay for his gambling and other personal expenses; instead, he initiated an electronic transfer from the Chase Account, but the result is the same.  Furthermore, Harrah's has not argued that the Cash Advances involved a two-step transaction through which the initial transfer from the Chase Account was made to Zambri rather than to Global, Harrah's agent.

that the transfer of funds by the Debtor to Harrah's to allow Zambri to gamble or use as he saw fit might be fraudulent and had the ability to decide whether that risk was worth the reward.

### b.    Reasonably Equivalent Value

Section 548(a)(1)(B)(i) requires the Trustee to demonstrate that the Debtor did not receive reasonably equivalent value in exchange for the transfers.  The undisputed facts show that the Debtor did not receive any value; Zambri received the value for his personal use.  The cash advance receipts, (*Joint Statement*, Ex. 7), identified Zambri as the Cardholder and Harrah's Title 31 Multiple Transaction Log, (*Joint Statement*, Ex. 10), identified Zambri as the patron.  Neither mentioned the Debtor nor indicated that the Debtor received the cash advances.  Furthermore, Harrah's does not suggest that Zambri used any of the cash advances to pay the Debtor's expenses or redeposited any portion in the Debtor's bank accounts.  In short, Zambri got the cash; the Debtor got none.

### c.    Harrah's Affirmative Defense

In contrasting the *liabilities* of initial and subsequent transferees, courts observe that the initial transferee is absolutely liable under 11 U.S.C. § 550(a) while the subsequent transferee may defend against liability under 11 U.S.C. § 550(b)(1) by demonstrating that it received the subsequent transfer for value, in good faith, and without knowledge of the avoidability of the initial transfer.  *See, e.g., Carroll v. Milner* (*In re Red Dot Scenic, Inc.*), 351 F.3d 57, 58 (2d Cir. 2003).  Although the initial transferee has no such defense to its liability under 11 U.S.C. § 550(a) once the transfer

is avoided, it enjoys a similar defense to the avoidance claim under 11 U.S.C. § 548(c) .[17] The transferee may defeat the avoidance claim, in whole or in part, by demonstrating that it received the transfer in good faith and gave value to the *debtor*. Assuming Harrah's good faith, it did not give value to the *debtor* for the reasons stated.

Accordingly, the Trustee's motion for summary judgment on Count 2 is granted, and Harrah's corresponding motion is denied. The Trustee is therefore entitled to a judgment under 11 U.S.C. § 550(a) in the sum of $850,449.60, which represents the aggregate amount of the Transfers less the 1% processing fee retained by Global.

### 3.     Unjust Enrichment

The Trustee's final cause of action, Count 7, asserts a claim of unjust enrichment against Harrah's. Each side moves for summary judgment on the claim. The Trustee argues that New York law governs; Harrah's contends that New Jersey law controls but does not identify a conflict, and there is none. *See Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 446 n.8 (S.D.N.Y. 2010) ("I do not engage in an independent choice of law analysis with respect to this claim for unjust enrichment because there is no difference between the law of the two interested jurisdictions-New York and New Jersey.") (citing *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F.Supp.2d 729, 733-34 (D.N.J.

---

[17]     Section 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

2008); *RCM Tech., Inc. v. Constr. Servs. Assocs., Inc.*, 149 F.Supp.2d 109, 114 (D.N.J. 2001))).  Accordingly, the Court will limit its consideration to New York law.

"Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Golden Pacific Bancorp v. F.D.I.C.*, 375 F.3d 196, 203 n.8 (2d Cir. 2004).  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).  Unjust enrichment "is available only in the unusual situation when, though the defendant has not breached a contract or committed a recognized tort, circumstances create an equitable obligation owed by the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  The typical case is one "in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled," and "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

The fraudulent transfer claim sounds in tort, and the unjust enrichment claim, as pleaded and argued, duplicates the Trustee's constructive fraudulent transfer claim. The *Amended Complaint* alleges that Harrah's was unjustly enriched because the Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Transfers.  (*Amended Complaint* ¶¶ 97, 99.)  Similarly, the Trustee argues that he is entitled to summary judgment on his unjust enrichment claim because the Debtor did not derive a benefit and did not receive any consideration for the transfers.  (*Trustee's*

*Motion* at 24.)  As it duplicates the Trustee's constructive fraudulent transfer claim, Count 7 is dismissed.

## CONCLUSION

The *Trustee's Motion* is granted to the extent of granting summary judgment on his constructive fraudulent transfer claim asserted in Count 2 and is otherwise denied. *Harrah's Motion* is granted to the extent of granting summary judgment dismissing Counts 1 and 3 through 7 and is otherwise denied.  The Court has considered the parties' other arguments and concludes that they lack merit.  As this opinion disposes of all of the claims in the case, the Trustee is directed to settle a judgment on notice consistent with this opinion.

So ordered.

Dated:  New York, New York
        July 24, 2020

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge